**AFFIRM; and Opinion Filed April 25, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-15-00735-CR**

**No. 05-15-00748-CR**

**No. 05-15-00749-CR**

**VANESA AGUILAR, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause Nos. F-1351857-K, F-1351858-K, and F-1351859-K**

## MEMORANDUM OPINION
Before Justices Fillmore, Stoddart, and Schenck
Opinion by Justice Fillmore

A jury found Vanesa Aguilar guilty of possession with intent to deliver methamphetamine, possession with intent to deliver cocaine, and possession with intent to deliver heroin. The trial court assessed punishments of fifteen years' confinement on the methamphetamine charge and ten years' confinement on each of the cocaine and heroin charges. In three issues, Vanesa[1] contends the trial court erred in denying her pretrial motions to suppress evidence found during a warrantless search of her apartment because: (1) her consent to search was involuntary; (2) although the State argued the drugs were found in plain view, police officers

---

[1] Given their common surname, we refer to Vanesa Aguilar and her father Ramiro Aguilar by their first names for clarity. A juvenile is referred to by several names in the record; we will refer in this opinion to that individual as "the Juvenile."

had no right to be inside Vanesa's bedroom and any drugs found were the product of an unreasonable search and seizure; and (3) an individual in Vanesa's apartment did not have authority to allow a police officer to enter the apartment and it was not reasonable for the police officer to believe the individual had authority to allow entry into the apartment. We affirm the trial court's judgments.

**Background**

Vanesa was charged with the following offenses: In Case Number F-1351857-K, possession with intent to deliver methamphetamine in an amount of 200 grams or more but less than 400 grams, *see* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) & (e) (West 2010); in Case Number F-1351858-K, possession with intent to deliver cocaine in an amount of four grams or more but less than 200 grams, *see* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) & (d); in Case Number F-1351859-K, possession with intent to deliver heroin in an amount of one gram or more but less than four grams, *see* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) & (c); and in Case Number F-1351860-K, possession of marijuana in an amount more than four ounces but less than five pounds, *see* TEX. HEALTH & SAFETY CODE ANN. § 481.121(a) & (b)(3) (West 2010). Prior to trial, she filed motions to suppress contending any and all items or evidence taken from her apartment by law enforcement officers on or about January 26, 2013, were illegally seized in violation of the Fourth and Fourteenth Amendments of the United States Constitution; Article 1, section 9 of the Texas Constitution; and articles 1.06 and 38.23 of the Texas Code of Criminal Procedure. Vanesa contended the search by police officers was without probable cause or exigent circumstances and that, in the absence of a search warrant or an exception to the search warrant requirement, any evidence seized was inadmissible at trial.

At the suppression hearing, Christopher Cooley, a police officer with the Dallas Police Department, testified that at approximately 3:00 a.m. on January 26, 2013, he made a traffic stop

–2–

of a car driven by Arlena Esquivel. Esquivel was arrested for possession of a controlled substance. The passenger in the vehicle driven by Esquivel was a minor of fifteen or sixteen years of age (the Juvenile). According to Cooley, the policy of the Dallas Police Department in this circumstance is to attempt to find an adult guardian to whom the juvenile can be released. The Juvenile informed Cooley she lived in an apartment within walking distance from where the traffic stop had taken place; she provided the name of her older sister with whom she lived in the apartment and directions to the apartment. Cooley walked to the apartment in an attempt to locate an adult guardian to whom the Juvenile could be released. For safety reasons, the Juvenile remained with Cooley's partner at the location of the traffic stop.

Upon arriving at the apartment, Cooley knocked loudly on the door and announced, "Dallas Police." The front door was opened by an adult Hispanic male, Felipe Renteria. Renteria appeared as if he had been woken by Cooley. Cooley inquired of Renteria as to who at the apartment was related to the Juvenile, and Renteria "kind of stare[d] at [Cooley] for a second." Cooley repeated the Juvenile's name. Cooley did not ask to enter the apartment or state he needed to come inside the apartment. Cooley testified he does not speak Spanish, and Renteria spoke "broken" English, and their attempt to communicate verbally was not working well. According to Cooley, he and Renteria were utilizing "a lot of body language" to communicate. Renteria motioned Cooley into the apartment by opening the front door "real wide" and waving Cooley inside, leading Cooley to believe he was at the correct location. As a result of the words Renteria did speak and the fact that Renteria physically waved Cooley into the apartment, Cooley felt he been invited inside the apartment and, from Cooley's perspective, Renteria had the authority to do so.

Once inside the living room of the apartment, Cooley and Renteria "kind of end up standing there for a second staring at each other." Cooley became slightly confused because he

thought Renteria clearly understood he was looking for an individual related to the Juvenile. Cooley saw a document posted on a wall with the Juvenile's name on it; Cooley pointed to the Juvenile's name on the document and asked Renteria if he was related to the Juvenile. Cooley saw a look of recognition on Renteria's face and Renteria began shaking his head and waving Cooley to "come towards me" as he backed into another location in the apartment. Renteria led Cooley to a closed bedroom door. Renteria opened the bedroom door, walked into the bedroom, and motioned Cooley to follow him into the bedroom. Cooley did not inquire of Renteria whether he had permission to go into the bedroom, but it appeared to Cooley that Renteria had authority to do so. Based on the sequence of events from the time he knocked on the front door to the point Renteria brought him to the bedroom, Cooley felt that Renteria understood what Cooley was asking or Cooley would not have been allowed into the apartment.

The lights were off in the bedroom, and Cooley loudly announced himself. Cooley saw that a male, Ramiro Aguilar, and Vanesa were asleep in a bed. Cooley did not believe Vanesa was on the phone. Vanesa awoke. Vanesa spoke and understood English. Cooley asked Vanesa if she was related to the Juvenile, and she said she was. Cooley told Vanesa he wanted to talk to her because the police needed to release the Juvenile to her. Vanesa stood and turned on an overhead light. Vanesa did not give Cooley the impression that she did not want him in the apartment. When the bedroom was illuminated, Cooley saw a plate of what appeared to be crack cocaine with several baggies of powder cocaine around it. Cooley had not conducted a search of the apartment and had not asked for consent to search the apartment at the time he observed what appeared to be controlled substances in plain view.

Cooley and Vanesa went to the kitchen, and Cooley explained the content of a consent-to-search form he asked Vanesa to sign. By this time, there were four or five officers in the apartment. Cooley watched Vanesa sign her written consent for the police officers to search the

apartment. Vanesa was at that point under arrest and not free to go. Although he could not recall whether Vanesa was handcuffed at that time, Cooley testified it was unlikely because Vanesa was pregnant. Ramiro was in the living room of the apartment at the time Vanesa signed the consent form. Cooley testified that, after the consent was signed, the police officers found more controlled substances in the apartment than appeared to be for "personal use," and officers with the Narcotics Department were contacted and arrived at the apartment.

Vanesa testified at the suppression hearing that she had leased the apartment, and neither Ramiro nor Renteria were parties to the apartment lease. Renteria was Ramiro's friend. Renteria had never been to her apartment previously, but was a guest there at the time of this incident. According to Vanesa, Renteria had driven her to Wylie, Texas, and it was late when they returned. Vanesa suggested Renteria could stay the night at her apartment and watch television and she would take him home the following morning.

Vanesa stated her apartment was small and, while she would probably have heard someone knocking on the front door, she did not hear Cooley knock on the front door. She did not hear Renteria speaking with Cooley.

Vanesa indicated Renteria had no authority to enter her bedroom and she had not given Cooley permission to come into her bedroom. Vanesa heard a knock on the bedroom door, but she acknowledged she did not know whether Cooley or Renteria knocked. According to Vanesa, Cooley did not announce himself before entering her bedroom. When the bedroom door opened and Cooley entered, the bedroom was dark and she was on the phone with her brother. Ramiro was asleep. Cooley asked if the Juvenile was Vanesa's sister. He then asked Vanesa to step into the kitchen.

According to Vanesa, Renteria did not walk into the bedroom. Vanesa testified that when "officers asked [her] to go step into the living room, [Renteria] had been sitting on the couch," which was the first time she had seen Renteria since she awoke.

Vanesa acknowledged signing a consent-to-search form. Cooley and a "variety of officers" had also been in and out of her bedroom, so she thought a search had already begun. Vanesa testified she felt intimidated and she signed the consent for a search of the apartment "to get it over with," because she felt a search of the apartment was going to take place anyway. At the point she signed the consent-to-search form, the police officers had told her that they were going to get a search warrant, but if she signed the consent form, she would have not have to wait outside in the cold with Ramiro. Vanesa testified she was crying when she signed the consent form.

The trial court signed findings of fact and conclusions of law that included the following findings of fact:

1. I find that officer Cooley reasonably believed that Felipe Renteria had authority to allow entry into the apartment.

2. I find that the emergency/caretaking exception to a warrantless entry does not apply in this case because Cooley was voluntarily admitted into the apartment in search of a relative for the juvenile he had detained.

3. I find that in the event the apparent authority to enter the apartment did not exist that the officer acted under the emergency/caretaking exception and it would apply because Cooley was seeking an adult to whom he could release the juvenile.

4. I find that Cooley was led to the bedroom door of [Vanesa Aguilar] by Renteria and opened the door at which time Cooley observed [Vanesa Aguilar and Ramiro Aguilar] in bed and apparent narcotics and paraphernalia in plain view.

5. I find that Vanessa [sic] Aguilar freely and voluntarily consented to the search of her apartment and executed consent to the search.

6. I resolve the conflicts in testimony between Vanessa [sic] Aguilar and officer Cooley against [Vanesa Aguilar and Ramiro Aguilar].[2]

The trial court concluded as a matter of law "that the search conducted after the consent was legal under the provisions of the Texas and Unites States Statutes and Constitutions." The trial court denied Vanesa's motions to suppress.

A jury found Vanesa guilty of possession with intent to deliver methamphetamine, cocaine, and heroin, and possession of marijuana.[3] The trial court assessed punishments of fifteen years' confinement for possession with intent to deliver methamphetamine, ten years' confinement for possession with intent to deliver of cocaine and heroin, and two years' confinement for possession of marijuana. Vanesa appealed her convictions for possession with intent to deliver methamphetamine (Appeal Number 05-15-00735-CR), cocaine (Appeal Number 05-15-00748-CR), and heroin (Appeal Number 05-15-00749-CR).[4]

**Motions to Suppress**

In three issues, Vanesa argues the evidence seized from the apartment should have been suppressed. Relative to the chronological order of the events of January 26, 2013, in her third issue, Vanesa argues Renteria did not have authority to allow Cooley to enter Vanesa's apartment and it was not reasonable for Cooley to be believe he did; in her second issue, Vanesa argues that, although the drugs were found in plain view, the officers had no right to be inside

---

[2] Like Vanesa, Ramiro was charged with the offenses of possession with intent to deliver methamphetamine, cocaine, and heroin, and possession of marijuana in Case Numbers F-1351853-K, F-1351854-K, F-1351855-K, and F13-51856-K, respectively. Vanesa and Ramiro were tried together.

Ramiro filed motions to suppress. The trial court's findings of fact with regard to the motions to suppress included the following findings specific to Ramiro:

7. I find that the Defendant Ramiro [Aguilar] does not have standing to contest the search because he had no reasonable expectation of privacy in the apartment.

8. I find that even in the event it is determined that Ramiro Aguilar had standing that the defendant Vanessa's [sic] consent controls in the absence of any objection by Ramiro [Aguilar].

[3] The jury found Ramiro guilty of guilty of possession with intent to deliver methamphetamine, cocaine, and heroin, and of possession of marijuana.

[4] Vanesa did not appeal her conviction in Case Number F-1351860-K for the offense of possession of marijuana.

her bedroom and any drugs found were the product of an unreasonable search and seizure; and in her first issue, Vanesa argues her consent to search was involuntary.

*Standards of Review*

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Brodnex v. State*, No. PD-1087-14, 2016 WL 1128274, at *3 (Tex. Crim. App. Mar. 23, 2016); *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion, but review the trial court's application of the law to the facts de novo. *Turrubiate*, 399 S.W.3d at 150. We review mixed questions of law and fact that do not turn on credibility and demeanor, as well as purely legal questions, de novo. *Brodnex*, 2016 WL 112827, at *3; *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). When reviewing the ruling on a suppression motion, the trial judge's determination of facts—if supported by the record—is afforded almost total deference. *Woodard*, 341 S.W.3d at 410; *see also Valtierra*, 310 S.W.3d at 447. We give the same deference to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012).

Regardless of whether a trial court grants or denies a motion to suppress, we view the evidence in the light most favorable to the ruling. *Wade v. State*, 422 S.W.3d 661, 666 (Tex. Crim. App. 2013). When, as here, the trial court makes specific findings of fact, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *see also State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013). If the trial court fails to make a

particular finding, we imply a fact finding to support the trial court's ruling when the evidence supports the implied finding. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).[5] We will reverse the trial court's ruling "only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Duran*, 396 S.W.3d at 571. We will uphold the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Story*, 445 S.W.3d at 732; *Turrubiate*, 399 S.W.3d at 150.

*Analysis*

The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by government officials. U.S. CONST. amend. IV.[6] A defendant asserting a search violates the Fourth Amendment bears the burden of producing evidence to rebut the presumption of proper conduct by law enforcement. *Woodward*, 341 S.W.3d at 412. The defendant can satisfy this burden by establishing the search occurred without a warrant. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007). The burden then shifts to the State to prove the search was reasonable under the totality of the circumstances. *Id.* at 672–73. The State may satisfy its burden by proving the existence of an exception to the warrant requirement. *See Gutierrez*, 221 S.W.3d at 685.

---

[5] *See also Lowery v. State*, No. 07-13-00195-CR, 2015 WL 410696, at *3 (Tex. App.—Amarillo Jan. 29, 2015, no pet.) (mem. op., not designated for publication) (even though trial court made written findings of fact following hearing on defendant's motion to suppress, omitted findings of fact are implied in favor of trial court's ruling if evidence supports the implied findings).

[6] The Fourth Amendment exclusionary rule is made applicable to the states through the due process clause of the Fourteen Amendment. *Mapp v. Ohio*, 367 U.S. 643, 650–51, 655 (1976); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

<u>Apparent Authority to Enter the Apartment</u>

In her third issue, Vanesa argues Renteria did not have authority to allow Cooley to enter her apartment and it was not reasonable for Cooley to be believe he did. The State responds that Cooley reasonably believed Renteria had apparent authority to consent to Cooley's entry into Vanesa's apartment.

An unconsented police entry into a residential unit constitutes a search under *Katz v. United States*, 389 U.S. 347 (1967). *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991), *abrogated in part on other grounds by Turrubiate*, 399 S.W.3d 147.[7] A warrantless police entry into a residence is presumed unreasonable unless the entry falls within one of a well-defined group of exceptions. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011). Voluntary consent is one such exception. *Id*. Even if actual authority to consent does not exist, "consent may be validly obtained from an individual with apparent authority over the premises." *Id*. (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). We determine apparent authority using an objective standard and ask "would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id*. (quoting *Rodriguez*, 497 U.S. at 188 (internal citations omitted)). The State must prove actual or apparent authority by a preponderance of the evidence. *Id*. Determinations of actual and apparent authority are reviewed de novo as mixed questions of law and fact. *Id*. at 757.

Here, in lieu of the Juvenile being released on the streets of Dallas, Texas at 3:00 a.m., which Cooley testified would have been unsafe for the Juvenile and a violation by the Juvenile of a curfew ordinance, Cooley followed the Juvenile's directions to her sister Vanesa's apartment to

---

[7] *See also Nickens v. State*, No. 05-11-00554-CR, 2012 WL 2581053, at *3 (Tex. App.—Dallas July 5, 2012, pet. ref'd) (not designated for publication).

locate Vanesa for purposes of releasing the Juvenile into her care. Renteria, an adult male, opened the front door of the apartment in response to Cooley's loud knocking and announcing "Dallas Police." Cooley did not ask to enter the apartment or state he needed to come inside the apartment. Cooley inquired who at the apartment was related to the Juvenile. Renteria replied by speaking "broken" English; Cooley repeated the Juvenile's name. Renteria then opened the front door "real wide" and motioned for Cooley to come into the apartment. Cooley testified that by these actions, he believed Renteria invited him into the apartment and Renteria had the authority to do so.

The trial court found Cooley reasonably believed Renteria had authority to allow Cooley's entry into the apartment, and Cooley was voluntarily admitted into the apartment in an effort to locate a relative of the Juvenile. Further, the trial court resolved any conflicts in the testimony of Vanesa and Cooley against Vanesa. Viewing the evidence in the light most favorable to the trial court's finding, the trial court could have found Cooley reasonably believed Renteria had authority to allow Cooley to enter the apartment. As Cooley arrived at Aguilar's apartment, he was attempting to locate the Juvenile's sister so that he could ensure the safety and well-being of the Juvenile. Cooley knocked on the front door of the apartment after 3:00 a.m., and Cooley could reasonably have believed that an individual opening the front door at that hour was a resident rather than a guest and had authority to permit entry into the apartment. Further, after hearing Cooley mention the name of the Juvenile repeatedly, Renteria motioned Cooley to enter the apartment through the front door even though Cooley had not asked to do so. We find that a person of reasonable caution could reasonably believe Renteria had authority to consent to entry of the apartment under those circumstances. *Limon*, 340 S.W.3d at 756–59. We conclude the trial court did not err in finding the entry into the apartment was lawful. We resolve Vanesa's third issue against her.

–11–

<u>Apparent Authority to Enter Vanesa's Bedroom</u>

In her second issue, Vanesa argues that, although the drugs were found in plain view, Cooley had no right to be inside her bedroom and any drugs found were the product of an unreasonable search and seizure. The essence of Vanesa's second issue is whether Cooley had a reasonable belief Renteria had the authority to allow him to enter the bedroom. *See Valtierra*, 310 S.W.3d at 448 ("Consent to enter a residence does not, without more, provide consent for a police officer to search the entire residence or objects therein."); *see also Alberti v. State*, 495 S.W.2d 236, 237 (Tex. Crim. App. 1973) (an invitation to officers to enter a residence ordinarily cannot be construed as an invitation or consent to search).

As discussed above, we have concluded the trial court did not err by finding Cooley reasonably believed Renteria had authority to consent to his entry into the apartment. Cooley testified that, once inside the living room of the apartment, he saw a document posted on a wall with the Juvenile's name written on it, and he pointed to the Juvenile's name and asked Renteria if he was related to the Juvenile. Renteria's face exhibited a look of recognition, and he began shaking his head and, just as he had motioned Cooley to enter the front door of the apartment, Renteria motioned for Cooley to follow him to another part of the small apartment. Renteria led Cooley to a closed bedroom door and opened the bedroom door, walked into the bedroom, and motioned Cooley to follow him into the bedroom. Cooley testified that, based on the sequence of events from the time he knocked on the front door of the apartment to the point where Renteria led him into the bedroom, he believed Renteria understood what Cooley was asking, and it appeared to Cooley that Renteria had authority to take him to the bedroom and to allow Cooley to enter the bedroom.

The trial court found "Cooley was led to the bedroom door of [Vanesa] by Renteria and opened the door at which time Cooley observed [Vanesa and Ramiro] in bed and apparent

–12–

narcotics and paraphernalia in plain view." Further, the trial court resolved any conflicts in the testimony of Vanesa and Cooley against Vanesa. Viewing the evidence in the light most favorable to the trial court's finding, the trial court could have found Cooley reasonably believed Renteria had authority to lead him to the bedroom door, open the bedroom door, and motion Cooley to enter the bedroom. Again, Cooley could reasonably have believed that an individual leading him through the apartment after 3:00 a.m. was a resident rather than a guest and had authority to permit entry into individual rooms in the apartment. Further, after hearing Cooley mention the name of the Juvenile repeatedly and point to a document posted on a wall in the living room with the Juvenile's name written on it, Renteria motioned Cooley through the apartment, opened the bedroom door, walked into the bedroom, and motioned Cooley to follow him into the bedroom. We find that a person of reasonable caution could reasonably believe Renteria had authority to consent to entry into the bedroom of the apartment under those circumstances. *Limon*, 340 S.W.3d at 756–59; *see also Hubert v. State*, 312 S.W.3d 554, 561 (Tex. Crim. App. 2010) ("[W]hen an officer reasonably, though erroneously, believes that third party purporting to provide consent has actual authority over the place or thing to be searched, apparent authority exists and the purported consent from the third party can serve to make the search reasonable.") (citing *Rodriguez*, 497 U.S. at 186).

We conclude the trial court did not err in finding the entry into the bedroom was lawful. We resolve Vanesa's second issue against her.

Consent to Search

In her first issue, Vanesa contends the trial court erred in denying her motions to suppress because her consent to search was involuntary.

Consent to search is an established exception to the constitutional requirement of a search warrant. *See State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997). The Fourth and

–13–

Fourteenth Amendments of the United States Constitution "require that a consent to search not be coerced, by explicit or implicit means, by implied threat or covert force." *Meekins v. State*, 340 S.W.3d 454, 458–59 (Tex. Crim. App. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). The voluntariness of a person's consent is a question of fact that is determined by analyzing all of the circumstances of a particular situation. *Id*. at 459 (internal citation omitted). "The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent search was voluntary or coerced." *Id*.

Reasonableness is the "touchstone for determining voluntary consent to search." *Id*. The standard for measuring the scope of consent under the Fourth Amendment is that of "objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id*. (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "[C]ourts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Id*. The ultimate question "is whether the person's 'will ha[s] been overborne and his capacity for self-determination critically impaired,'" such that the consent to search must have been involuntary. *Id*. (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). The State must prove the voluntariness of a consent to search by clear and convincing evidence. *Id*.[8] Because issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *Id*. Here, the State, as the prevailing party at trial on the motions to suppress, "is afforded the strongest

---

[8] Trial courts may consider numerous factors in determining whether consent to search was free from coercion. *Meekins*, 340 S.W.3d at 460. For example, factors to be considered include "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances." *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998) (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994)). Further, "[t]he fact that a person is under arrest does not, in and of itself, prevent a free and voluntary consent from being given. It (custody) is merely one of the factors to be considered." *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985) (citations omitted).

–14–

legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id*. (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

Vanesa, who spoke and understood English and was within two weeks of her twenty-first birthday, signed a written consent for the police to search the apartment. Between the time of Cooley's arrival at the apartment and Vanesa signing the consent-to-search form at 3:45 a.m., other police officers had arrived at the apartment; there were four or five police officers in the apartment when Vanesa signed the consent form. Cooley sat with Vanesa in the kitchen and explained the consent-to-search form to her, and he witnessed Vanesa signing the form. At that point, Vanesa was under arrest and not free to go. Although he could not recall whether Vanesa was handcuffed at that time, Cooley testified it was unlikely because Vanesa was pregnant. Ramiro was in the living room of the apartment at the time Vanesa signed the consent form.

Vanesa acknowledged signing the consent-to-search form. The consent form, also signed by two officers of the Dallas Police Department as witnesses, states that, having been informed by Cooley, an officer of the Dallas Police Department, "of [her] Constitutional Right not to have a search conducted, exemplars or samples taken, or evidence seized from [her] without a search warrant, and having been told of [her] right to refuse such a search or seizure," Vanesa authorized the officers to conduct a search of her residence. Vanesa's consent further stated the officers were:

> authorized by [her] to take any stolen property, implements of crime, instrumentality or other property which may have been used, obtained or possessed in violation of the laws of Texas, any other States, or of the United States; any physical evidence which they believe to be evidence of a suspected criminal offense; or any items which they believe to be relevant to the investigation of a suspected criminal offense.

The consent-to-search form signed by Vanesa indicated that her permission to search was given "voluntarily and without threats or promises of any kind" and was given "with [her] full and free consent."

According to Vanesa, Cooley and a "variety of officers" had also been in and out of her bedroom, so she thought a search had already begun. Vanesa testified she felt intimidated and she signed the consent for a search of the apartment "to get it over with," because she felt a search of the apartment was going to take place anyway. At the point she signed the consent-to-search form, the police officers had told her that they were going to get a search warrant, but if she signed the consent form, she would have not have to wait outside in the cold with Ramiro. Vanesa testified she was crying when she signed the consent form.

The trial court found Vanesa "freely and voluntarily consented to the search of her apartment." The trial court's determination of the voluntariness of Vanesa's consent turned on Cooley's and Vanesa's credibility and demeanor, and the trial court was the exclusive trier of fact and judge of the witnesses' credibility. *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Thus, the trial court was free to believe Cooley's account that, while Ramiro sat in the living room, Cooley sat in the kitchen with Vanesa and explained the consent-to-search form to her. Further, the trial court heard Vanesa's testimony at the suppression hearing, confirming Cooley's account that Vanesa spoke and understood English. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (judge may believe or disbelieve all or any part of a witness's testimony). Here, the trial court specifically "resolve[d] the conflicts in testimony between Vanesa Aguilar and officer Cooley against [Vanesa]."

Based on Cooley's account of the circumstances surrounding Vanesa's consent, the evidence supports a finding by clear and convincing evidence that Vanesa's consent to the search of her apartment was free and voluntary. Moreover, the record in this case does not demonstrate Cooley threatened, intimidated, coerced, or used any type of force to secure Vanesa's consent to search. When viewed in the light most favorable to the trial court's ruling, the totality of the circumstances demonstrate Vanesa freely and voluntarily consented to search of her apartment.

At the very least, an implicit trial court finding that Vanesa's will was not overborne and her capacity for self-determination was not critically impaired when consenting to search of the apartment was supported by evidence and not clearly erroneous. *See Meekins*, 340 S.W.3d at 459. We resolve Vanesa's first issue against her.

## Conclusion

We have given due deference to the trial court's denial of Vanesa's motions to suppress, and we conclude the trial court did not abuse its discretion by denying Vanesa's motions to suppress. We affirm the trial court's judgments in Case Numbers F-1351857-K, F-1351858-K, and F-1351859-K.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

150735F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

VANESA AGUILAR, Appellant

No. 05-15-00735-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4, Dallas County, Texas,
Trial Court Cause No. F-1351857-K.
Opinion delivered by Justice Fillmore, Justices Stoddart and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 25th day of April, 2016.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

VANESA AGUILAR, Appellant

No. 05-15-00748-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 4, Dallas County, Texas,
Trial Court Cause No. F-1351858-K.
Opinion delivered by Justice Fillmore,
Justices Stoddart and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 25th day of April, 2016.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

VANESA AGUILAR, Appellant

No. 05-15-00749-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4, Dallas County, Texas,
Trial Court Cause No. F-1351859-K.
Opinion delivered by Justice Fillmore,
Justices Stoddart and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 25th day of April, 2016.